### Succession of Thomas Durnford—John McDonogh, Appellant.

The obligations of a warrantor depend upon the law in force at the time of the sale.

Under the Code of 1808, the vendor was bound, in case of eviction of the purchaser, to pay him, in addition to the price, &c. the increased value of the property at the date of the eviction, though the purchaser did not contribute to such increase. Book 3, tit. 6, arts. 54, 57. The original price, added to the rents and profits, does not necessarily constitute the measure by which the liability of the warrantor is to be ascertained; other things must be taken into consideration; and the general rule, that damages are to be measured by the loss actually sustained, and not by the gains of which the party has been deprived, is inapplicable.

The curator of a succession credited himself in his account with a sum, exceeding the amount of the assets of the succession in his hands, which he claimed in consequence of eviction from land sold to him by the deceased. On the opposition of the heirs, it was decided, that the claim of the curator, so far as it exceeded the assets in his hands, was prescribed; and judgment was rendered allowing his claim to the amount of such assets. On appeal: *Held,* that the claim was an entire one, arising from the same cause, and could not be prescribed in part; and that the account should be homologated.

APPEAL from the Court of Probates of New Orleans, *Watts,* J. GARLAND, J. This case was before us in June last (See 8 Rob.), and was then decided as to all the points at issue, except so far as relates to a demand of twenty-one thousand five hundred dollars, set up by the curator against the heirs and opponents, as being the value of a tract of land, of which he was

evicted by the syndic of DeGruys (See 2 La. 544), in which respect the judgment of the Probate Court was reversed, and the case remanded for a new trial, for the purpose of ascertaining what was the real value of the land sold by Durnford to McDonogh, at the time of eviction, in July, 1831.

On the new trial, a large number of witnesses were examined, and their testimony and estimates taken down in detail. They were examined as to the quality and quantity of the land, its situation, its capacity to produce sugar and other products, the facilities of navigation and communication with New Orleans, and as to many other things ; also as to its value at almost every period from the date of the sale in 1823, up to the time of the trial.

From the statement of the witnesses, the sale from Durnford, and the record of *DeGruy's Syndic* v. *Hennen and McDonogh*, we ascertain that, in 1823, Durnford sold to Hennen, as agent of McDonogh, a tract of land of thirty *arpents* front on the bayou Ouacha, by a depth of 110 *arpents*, for the sum of $4,000, with a full warranty of title. In July, 1831, McDonogh was evicted of this tract of land by the syndic of DeGruys (2 La. 544), and he now claims $21,500, as the damages sustained by the eviction. The land is situated about eighteen miles from this city, fronts on one bayou, and has another, called *des Familles*, running longitudinally through it, nearly its whole depth of 110 *arpents*. It is this circumstance which has in some, if not a great degree, led to confusion in the statements of the witnesses, and to their widely different estimates of its value, as some of them seem to have spoken under the impression, that the depth of the high or tillable land was to be calculated from the bayou *des Familles*, instead of commencing on the Ouacha, and running parallel, or nearly so, with the other stream. They all state that the high land is of excellent quality, well adapted to the culture of sugar-cane ; but they differ widely as to the quantity of such land, and the value. This difference, no doubt, arises from the uncertain and contradictory bases assumed for the various calculations. Several witnesses of respectability and intelligence estimate the value as high as $30,000, in 1831. One fixes

it at about $17,500 ; a third, at from nine to twelve thousand dollars; another says $5,000; and Dugué says, the land was worth only $3,000 in 1831, and $6,000 in 1837 ; but this latter estimate is met by the fact that, at that period, about two-thirds of the tract actually sold at public auction for $21,500, which goes to prove that his estimate is not of much weight. Some of the witnesses have only seen the land on the bayou *des Familles;* others have not examined it particularly. Some put no estimate on it at all, whilst Bringier and Hemecourt, who are surveyors, and know it well, value it highly. Bennet and Durnford have known the land a long time—have been over it, and they appraise it at a high rate. The witnesses who know the land best, value it the highest. The witness Millaudon, and one or two others, have a sliding scale of valuation, and raise, or depress the price, as sugar goes up, or declines in its market price. According to them the land would be much more valuable one year than another. Some of the witnesses testify as to the value of the land in 1823, in 1825, and at other dates up to 1831 ; and also as to the gradual increase of the value of the land from 1823 to 1831 ; but their calculations are as various on that point, as on any of the others. In the argument, the counsel for the opponents admitted, that an increase in the value of the land from 1823 to 1831 was proved ; and stated it as amounting to about twenty-five per cent on the price given in 1823.

The probate judge, in the reasons for his opinion, says that he thinks the evidence makes out the value of the land at the time of eviction, as exceeding the assets of which the curator had the *seizin,* when the heirs presented themselves ; but he refused to give a judgment in favor of McDonogh for more than the sum admitted to be to the credit of the succession of Durnford,* as, he says, the excess is barred by prescription. From this judgment McDonogh has appealed; and the heirs have also joined in it ; he praying, that the amount may be increased, and he declared a creditor of the estate ; and the heirs asking that his demand be rejected, or that the sum allowed by the court below be reduced.

* 9,809 26.

When this case was last before us, it was decided that, as the contract of sale between Durnford and McDonogh was made under the old Code, the law in force in 1823 was to regulate the claim for damages consequent on the eviction; and further, that prescription did not operate as a bar to the claim.

In the old Code, p. 354, art. 54, we find the law to be, that the buyer, if evicted, "has a right to claim against the seller: 1st, the restitution of the price; 2d, that of the fruits or revenues, when he is obliged to return them to the owner, who evicts him; 3d, all the costs occasioned, either by the suit in warranty against the buyer, or by that brought by the original plaintiff: 4th, in fine, the damages, when he has suffered any, besides the price that he has paid." Article 57 says: "If, at the time of eviction, the thing sold has risen in value, even without the buyer having contributed thereto, the seller is bound to pay him the amount of said augmentation of value above the price of the sale. Article 1663 of the Code Napoleon, is almost in the same terms. The above articles of the old Code have heretofore been brought up for the consideration of this court, and in the case of *Fletchers' Heirs* v. *Cavelier, &c.* (10 La. 117), it was decided, that the obligations of the warrantor depend on the law in force at the time of sale, and that, according to the above articles, the seller is bound, on the eviction of his vendee, to pay the augmented value of the property, above the price of the sale; and the court said, in commenting upon the argument of the counsel for the warrantors, "it is, therefore, clear, that the original price added to the rents and profits, does not necessarily constitute the measure by which the liability of the warrantor is to be tested." Other things must, therefore, be taken into consideration.

Toullier, title 3, *Des Contrats*, No. 285, in commenting on the article 1633 of the Code Napoleon, says it seems to contain an exception to the general principle as to the responsibility for damages, and that if a *heritage*, or piece of ground is sold in good faith, which since the sale has quadrupled in value by the establishment of a new city, or the opening of a canal, or any other extraordinary event, the seller is bound, in case the vendee is evicted, and, notwithstanding his good faith, to reimburse what the ground may be worth, over and above the price, although

the event which has quadrupled the value, was not, and could not be foreseen.  See also 16 Duranton, p. 313, No. 295.  27 Dalloz, part 1, p. 93.  There is, in fact, not much difference of opinion as to what the law is ; but the application of it to this case is the question.  The counsel for the opponents do not deny, if there has been an actual augmentation in the value of the land between 1823 and 1821, that they are bound to reimburse it ; but they deny that there has been an increase to the extent claimed.  Their idea seems to be,. that some regular scale of augmentation should have been adopted and proved by the witnesses, and that their opinions of what was the value of the land in 1831, should not be the measure of damages.  They say that the land remained in the same state at each period, and that there was little or no augmentation in value; and that if the opinions of the witnesses introduced by McDonogh should prevail, it would enable him to make an enormous speculation. These arguments are plausible, but they do not strike us as being exactly correct.  The law is, that the vendee, when evicted, is entitled to recover the value of the property at the time of the eviction, and, therefore, the expression used, that if " the thing sold has risen in value, even without the buyer having contributed thereto, the seller is bound to pay him the amount of said augmentation."  It is clear that the law-maker intended that the vendee, when evicted, should be indemnified fully, and the general rule as to damages is not applicable, that is, they are not to be measured by the loss the party has actually sustained, but by the gain of which he has been deprived ; therefore McDonogh is entitled to the value of the land in 1831, and it remains to be ascertained what that value was.  The counsel for the opponents are of opinion, that in weighing the testimony, the price given in 1823 should always be kept in view.  We do not think so.  The simple question is, what was the value of the land in July, 1831, the date of eviction ? and to fix it, we know of no other criterion than what the property is worth, or would sell for, in the opinion of witnesses sworn to estimate it. It is a question of fact, and, like other questions, must be settled by considering all the testimony given.

We have already said that the estimates of the witnesses are

widely different; it is, therefore, our duty to examine them all, and ascertain the true state of the case. There is nothing in the record to induce us to believe, that the witnesses are not all entitled to credit; we have, therefore, considered the circumstances under which they have testified, and their opportunities of knowing the land at the period in question. Détrehan, Bennett, Bringier and Durnford, estimate the land at a high rate. Hemecourt does not value it so highly. His own land, which adjoins that sold to McDonogh, he thinks is worth $1,000 the front *arpent*, but he thinks his land is the best; other witnesses think it is not. Boutté and Villars do not fix any particular sum; but the former thinks it is a fine tract, and the latter is of a different opinion. Millaudon, Commagère and Dugué, each fix upon much smaller sums than the others. The latter values it, in 1831, at $1,000 less than it sold for in 1823; and says that, in 1837, it was not worth more than $6,000, when it was actually sold for $21,500. After a full consideration of all the testimony, we are of opinion that the land was, on the day of eviction, the 19th of July, 1831, worth about the sum of eighteen thousand dollars; which sum McDonogh is entitled to have a credit for at the above date, in the settlement of his account as curator of Thomas Durnford.

The Court of Probates decreed that the curator should have a credit on his account for the sum of $9,809 26, which was the balance of the estate remaining in his hands; although, in the reasons given by the judge for his judgment, he, in effect, says the evidence showed that the land was worth a great deal more: but he is of opinion, that so much of the claim as exceeds the assets in the hands of the curator, is prescribed. In this we think the judge wrong. The claim set up is an entire one, arising from the same cause; and we cannot see how a part of it is prescribed, and a part not. The fact of the succession not being sufficient to pay all the demands against it, cannot give rise to prescription. When this cause was before us in June last, we said, in terms, that the claim set up was not prescribed; and, in approving that part of the reasons or arguments of the judge to prove that prescription did not run against it at all, it cannot be fairly said, that his arguments to prove that a part

was prescribed, were approved also. The judgment of the Probate Court rejecting this claim, was reversed in this court in all its parts, and the case remanded to enable that tribunal to ascertain the amount of it, and to strike the balance. If we had been of opinion that the claim was prescribed, it would have been inconsistent with the plain rules of common sense to have sent it back for a new trial, and thus impose a useless duty on the Probate Court. The former judgment of this court will not bear any such interpretation as has been put on it; and, consequently, the probate judge erred in deciding, that so much of the claim set up by the curator as exceeded the assets in his hands, was barred by prescription.

For the purpose of finally closing the account of McDonogh according to law, it will be necessary to remand the cause again to the Probate Court, where the judge can enter a credit for eighteen thousand dollars on the account of the curator, on the 19th of July, 1831, strike the balance, and give a judgment according to article 1007 of the Code of Practice.

It is, therefore, ordered and decreed, that the judgment of the Probate Court be annulled and reversed, and the case remanded to that court, with directions to the judge thereof, in the settlement of the account of John McDonogh, as curator of the estate of Thomas Durnford, deceased, to give said McDonogh a credit on said account for the sum of eighteen thousand dollars, of the date of the 19th of July, in the year 1831, and to close the account, and give judgment according to law; the opponents paying all the costs of their oppositions, and of this appeal; the other costs in settling the succession accounts, to be paid out of the funds in the hands of the curator.

*A. Hennen*, for the appellant.

*Elmore* and *W. W. King*, for the heirs.